IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL TREGLIA,<br><br>    Plaintiff,<br> vs.<br><br>MATTHEW CATE, et al.,<br><br>    Defendants. | No. C 10-0757 LHK (PR)<br><br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT; DENYING OTHER<br>MOTION AS MOOT<br><br>(Docket Nos. 86 & 112) |

Plaintiff, a state prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against various Pelican Bay State Prison ("PBSP") officials, including Defendants Matthew Cate, Francisco Jacquez, Ranell Chisman, Glenn Kelley, O'Donnell, Clancy, Scott Kernan, Maureen McLean, Carbrera, Dahard (incorrectly referred to as "Daharshi" in complaint), Darby and C. Howell. Plaintiff maintains Defendants violated his rights under the Eighth Amendment and denied him due process when they placed him on contraband surveillance watch for three days in August 2009.[1] Plaintiff also alleged a state law claim, over which the Court in its discretion exercised supplemental jurisdiction.

Defendants have moved for summary judgment, arguing that there is no genuine issue of

---

[1] The Court dismissed Defendants Vanderhoofvan, Schrock and Moore from this action, for Plaintiff's failure to state a cognizable claim against them. (*See* Docket no. 28.) Defendant M.D. Yax was dismissed from this action as Plaintiff did not name him in his seventh amended complaint, which is the operative complaint in this action. (*See* Docket no. 55.)

material fact, that there was no violation of Plaintiff's constitutional rights, and that Defendants are entitled to qualified immunity. (*See* Docket no. 86.) Plaintiff filed his opposition. Defendants filed their reply. Having carefully considered the papers submitted, the Court hereby GRANTS Defendants' motion for summary judgment for the reasons set out below.

## BACKGROUND[2]

I.     Contraband Surveillance Watch

The CDCR Department Operations Manual ("DOM") authorizes correctional staff to place an inmate on contraband surveillance watch ("CSW") when: (1) it becomes apparent through medical examination, direct observation, or reasonable suspicion that an inmate has ingested or otherwise concealed contraband in his body, and the inmate cannot or will not voluntarily remove and surrender the contraband, or (2) when a physician has determined that the physical removal of contraband may be hazardous to the health and safety of the inmate. (R. Graves Decl. ¶ 2, Ex. A.) The inmate is placed in a medically approved, controlled, and isolated setting under constant visual supervision and observation until the contraband can be retrieved through natural means, or is voluntarily surrendered by the inmate. (*Id.*) Contraband is "anything that is not permitted, in excess of the maximum quantity permitted, or received or obtained from an unauthorized source." (Mot. Summ. J. ("Mot.") at 3, citing Cal. Code Regs. tit. 15, § 3000.) According to regulations, inmates are prohibited from possessing contraband, including weapons, destructive devices, and material that is reasonably deemed to be a threat to legitimate penological interests. *Id.*, §§ 3006(a) and (c)(16). Anything in possession of an inmate that is not contraband but will if retained in possession of the inmate, present a serious threat to facility security or the safety of inmates and staff, shall be controlled by staff to the degree necessary to eliminate the threat. *Id.*, § 3006(d). Any inmate who is harboring contraband internally represents an immediate threat to the safety of himself, others, and the security of the institution. (Graves Decl. ¶ 3.)

---

[2] The following facts are undisputed unless otherwise indicated.

1  If an inmate is suspected of harboring contraband internally, he is placed on contraband watch. (*Id.*) Contraband watch operations are governed by the policies and procedures contained in CDCR's DOM § 52050, et. seq. (*Id.*, Ex. A.) Contraband watch operations at PBSP are conducted in accordance with Operations Manual Supplement to § 52050.23, dated November 2008. (*Id.*, Ex. B.) Inmates placed on CSW are placed in an isolated setting for the duration of the watch to meet the objective of retrieving the concealed contraband. (Graves Decl. ¶ 2, Ex. A.)

Before an inmate is placed on CSW, staff conducts several actions, including medically assessing the inmate, thoroughly searching the inmate, fully securing, searching, cleaning, and searching the contraband watch observation cell, and placing the inmate in appropriate clothing. (*Id.*, Ex. A. at OAG-001.) If the temperature setting is below 65 degrees, the inmate is provided a blanket. (*Id.*) Staff will check the cell once per day to ensure its cleanliness for the duration of the CSW, and the inmate remains under constant visual observation. (*Id.*)

When placed on contraband watch, the inmate is secured in leg and waist restraints. (*Id.*, Ex. A, CDR DOM § 52050.23.4.) Since late 2008, contraband watch includes the use of a hard plastic Tube Device attached to the inmate's hands to cover them, and is only removed in staff's presence. (*Id.* at ¶ 5, Ex. B.) The inmate remains in restraints for the duration of the time on watch, and the tube device is removed during meals and bowel movements. (*Id.*) Statistics show that the use of the Tube Devices and other hand coverings has greatly increased the contraband-interception success rate. (*Id.* at ¶ 7-10, Ex. C.)

When an inmate indicates that he needs to defecate or urinate, prison staff provides him with a portable toilet and two buckets lined with plastic bags. (*Id.*, Ex. A, CDCR DOM § 52050.23.7.) The inmate defecates into the portable toilet and buckets, and the waste is removed and examined for contraband. (*Id.*) During the CSW, medical personnel assess the inmate daily, and the staff documents the result. (*Id.*, Ex. A., CDCR DOM § 52050.24.)

II.  Plaintiff's Placement on CSW

On Thursday, August 13, 2009, while housed in administrative segregation ("ad-seg") at PBSP, Plaintiff started a paper fire in his cell to "protest[] the inhumane treatment, racism,

sexism, and unconstitutional living conditions at PBSP, AD/SEG Unit." (Compl. ¶ 16.) Prison staff rescued Plaintiff from the cell fire, immediately transported him to Sutter Coast Hospital where he was treated for smoke inhalation. (*Id.* at ¶ 18-19; Mot. at 5; K. Lewis Decl. ¶ 7, Ex. F.) He was returned to PBSP the next day. Plaintiff was later issued a rules violation report for arson. (Lewis Decl. ¶ 4, Ex. C.)

On Friday, August, 14, 2009, Plaintiff was seen by psychologist, Dr. Schrock[3] to determine whether Plaintiff was suicidal. (*Id.* at ¶ 23.) According to Plaintiff, although he was asked numerous times whether he still had matches, he continually insisted that he no longer had anymore matches. (*Id.*) According to Defendants, Plaintiff admitted to Dr. Schrock that he had leftover contraband secreted in his body. (*Id.* at ¶ 7, Ex. F.) He was escorted to PBSP's Correctional Treatment Center ("CTC") where he remained overnight, from Friday, August 14, 2009 until Saturday, August 15, 2009. (Compl. ¶ 22.)

On August 15, 2009, Plaintiff was medically cleared. (*Id.* at ¶ 25.) Plaintiff was given a written notice that he was being placed on contraband watch in the SHU because he was suspected of "concealing tobacco, matches, and pen tips on your person" based on his own statement, "'I also brought in some tobacco and pen tips. I still have a few matches left.'" (Lewis Decl., Ex. D at OAG-018.)

Plaintiff was escorted to D-facility of the SHU, where Defendants O'Donnell and Dahard placed him in his designated CSW cell. (Compl. ¶ 26.) Plaintiff claims that he offered to sign a waiver and to submit to an X-ray prior to being placed on CSW, but that Defendant O'Donnell informed him that X-rays were no longer an option. (*Id.*) According to Defendants, an inmate may be subjected to an X-ray examination in accordance with the DOM before placement on contraband watch only for legitimate medical reasons. (Graves Decl. ¶ 4, Ex. A.) It is undisputed that Plaintiff was assessed by medical staff before placement on CSW, and that the medical-assessment results were documented on the proper form. (Lewis Decl. ¶ 7, Ex. F.)

Plaintiff was placed in boxer shorts and a T-shirt. (*Id.* at ¶ 5, Ex. D.) In accordance with regulations, Defendants O'Donnell and Dahard placed Plaintiff in restraints, which included

---

[3] *See supra* at 1, n. 1.

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.10\Treglia757_grant-msj.hhl.wpd

4

1  wrapping duct tape around Plaintiff's waist, thighs, ankles and arms, and attaching a Tube
2  Device to Plaintiff's hands to cover them. Plaintiff claims that they wrapped the tape so hard
3  that it caused his circulation to be "cut off, resulting in painful numbness." (Compl. ¶ 27.)
4  When Plaintiff later asked Defendant Dahard why such a contraption was necessary, he was told
5  that it was to prevent him from eating his "crap." (*Id.* at ¶ 32.) Plaintiff was then placed inside
6  an empty cell with a concrete slab and a door with holes in it. (*Id.* at ¶ 30.) Later that night,
7  Defendant O'Donnell brought Plaintiff an "unclothed plastic mattress." (*Id.* at ¶ 33.) When
8  Plaintiff asked for sheets and blankets, he was told that neither were permitted under policy. (*Id.*
9  at ¶ 33.)

10  Plaintiff claims that throughout the CSW, he complained to different Defendants that his
11  restraints were too tight but that Defendants continually disregarded his complaints. Plaintiff
12  claims that he had trouble sleeping at night, due to "numbness caused by duct tape, torture tubes,
13  gloves, and chains, as well as… difficulty breathing (shortness of breath)." (*Id.* at ¶ 38.)
14  Plaintiff claims that he was never provided with blankets, sheets or warmth, despite his
15  complaints of being cold and freezing. (*Id.* at ¶ 51.)

16  The prison employees who observed Plaintiff while he was on CSW kept a log every 15
17  minutes. (Lewis Decl., Ex. D.) According to the log, the temperature in Plaintiff's cell was
18  consistently monitored and noted to be 72 degrees Fahrenheit. (*Id.*) Each day, Plaintiff was
19  given a mattress at approximately 7:00 a.m., and the mattress was removed at approximately
20  7:30 a.m. the following morning. (*Id.*) Plaintiff received food and water throughout the watch.
21  (*Id.*) Medical staff examined Plaintiff on six different occasions and noted no injuries. (*Id.* at
22  OAG-022 – OAG-034.) On August 18, 2009, medical staff noted no injuries except two small
23  abrasions the size of nickels on Plaintiff's right elbow. (*Id.* at ¶ 5, 7, Exs. D, F.)

24  On August 16, 2009, at approximately 10:20 a.m., Plaintiff defecated a number of
25  contraband items, including three pencil leads, a single-edge razor blade, two hypodermic
26  needles, and a handwritten note. (*Id.* at ¶ 4, Ex. C.) Plaintiff received a rules violation report for
27  possession of a deadly weapon. (*Id.*) Plaintiff remained on CSW for approximately 72 hours –
28

1 from Saturday, August 15, 2009, 5:45 p.m., until Tuesday, August 18, 2009, 11:45 a.m – when
2 he was returned to ad-seg after three contraband-free bowel movements.

## MOTION FOR SUMMARY JUDGMENT

I. <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

///

## II. Evidence Considered

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). In support of Defendants' motions for summary judgment, declarations have been filed by Correctional Officers R. Graves, D. O'Donnell, and F. Vanderhoofven, with supporting exhibits, as well as a declaration by counsel for Defendants, Deputy Attorney General K. Lewis, with supporting exhibits. Defendants have also filed a request for judicial notice of facts showing Plaintiff's failure to comply with the California State Tort's Act.

Plaintiff verified his complaint and opposition by signing them under "penalty of perjury."

## III. Analysis

### A. Eighth Amendment - Medical Needs

Plaintiff claims that Defendants disregarded his complaints of "breathing difficulties, numbness in body, nausea, exhaustion, sleep deprivation, [and] body aches" and that they "did not do anything to prevent or minimize Plaintiff's pains and sufferings." (Compl. ¶ 52.) Plaintiff claims their actions constitute deliberate indifference, in violation of the Eighth Amendment.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* A prison official exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id.*

Even viewing the evidence in a light most favorable to Plaintiff, he fails to show that he was suffering from "serious" medical needs. According to the undisputed evidence, medical staff examined Plaintiff six times while he was on CSW. (Lewis Decl., Ex. D at OAG-022-030.) The first time was on August 15, 2009, one hour after Plaintiff was placed on CSW, when medical staff interviewed him and gave him his medication. (*Id.*) On August 16, 2009, at 8:20 a.m., Plaintiff was again evaluated and given a cough drop. (*Id.*) Later that same day, at 8:30 p.m., Plaintiff was again medically evaluated and given medication. (*Id.*) On August 18, 2009, Plaintiff was medically evaluated twice. (*Id.*) Medical personnel noted no injuries and cleared Plaintiff for release. (*Id.*, Ex. F at OAG-056.) The only injury that was worth noting was discovered by Defendant Nurse C. Howell, who had examined Plaintiff on multiple occasions. Nurse Howell documented a "reddened area" to Plaintiff's right elbow in two small spots. (*Id.*) PBSP medical staff also performed a post-CSW medical examination on Plaintiff, noting no injuries and clearing him for release to custody and return to ad-seg. (*Id.*, at OAG-057, 060.)

Even assuming that Plaintiff's alleged numbness and shortness of breath constituted "serious medical needs," the evidence fails to show that Defendants knew of and yet disregarded a substantial risk of harm to Plaintiff's health. According to the daily log, Plaintiff was observed standing, sitting, laying down, sleeping, and talking. Other than his complaints of discomfort, there is nothing in the record to indicate that Defendants had reason to believe that the continued use of the restraints was subjecting Plaintiff to an excessive risk of harm. Furthermore, Defendants were aware that Plaintiff was continually being medically monitored and receiving his medication. There is no indication that medical staff ever advised Defendant Correctional Officers that Plaintiff was suffering physical distress from his restraints such that they could draw the inference that the restraints constituted a "substantial risk of serious harm" to Plaintiff's health. Accordingly, Defendants are entitled to summary judgment on this claim as a matter of law. *See Celotex Corp.*, 477 U.S. at 323.

  B.  <u>Eighth Amendment - Basic Needs</u>

1    Plaintiff claims that Defendants deprived him of "blankets and sheets for warmth from cold, showers, hygiene, and cleaning products to stay clean and prevent catching diseases, as well as safety from physical pain and suffering." (Compl. ¶ 75.)

The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Amendment also imposes duties on these officials, who must provide all prisoners with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety. *See Farmer*, 511 U.S. at 832; *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199-200 (1989); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, *id.* (citing *Wilson*, 501 U.S. at 297).

Viewing the evidence in a light most favorable to Plaintiff, the conditions he experienced in CSW were not sufficiently serious to violate the Eighth Amendment. In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider "the circumstances, nature, and duration of the deprivation." *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "The more basic the need, the shorter the time it can be withheld." *Id.* Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. *See id.* at 732-733.

To be sure, Plaintiff did endure uncomfortable conditions that at times were painful. However, the conditions did not last long, and he was provided all of the basic necessities of life, including shelter, food, drinking water, clothing, and medical attention. *See supra* at 5. Although Plaintiff claims that he was cold, the daily thermometer readings indicated that the temperature in his cell was 72 degrees. Enduring the conditions he describes for three days is not the sort of deprivation that rises to the level of an Eighth Amendment violation. *Cf. Hearns v. Terhune*, 413 F.3d 1036, 1041-42 (9th Cir. 2005) (allegations of serious health hazards in

disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions); *see e.g.*, *Anderson v. County of Kern*, 45 F.3d 1310, 1314 (9th Cir.) ("[A] lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment."), *amended*, 75 F.3d 448 (9th Cir.), *cert. denied*, 516 U.S. 916 (1995); *Holloway v. Gunnell*, 685 F.2d 150 (5th Cir. 1985) (no claim stated where prisoner forced to spend two days in hot dirty cell with no water); *Miles v. Konvalenka*, 791 F. Supp. 212 (N.D. Ill. 1992) (single instance of finding mouse in food not actionable); *Evans v. Fogg*, 466 F. Supp. 949 (S.D.N.Y. 1979) (no claim stated by prisoner confined for 24 hours in refuse strewn cell and for two days in flooded cell).

Although the Eighth Amendment protects against cruel and unusual punishment, this does not mean that federal courts can or should interfere whenever prisoners are inconvenienced or suffer de minimis injuries. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (8th Amendment excludes from constitutional recognition de minimis uses of force); *Anderson*, 45 F.3d at 1314-15 (temporary placement in safety cell that was dirty and smelled bad did not constitute infliction of pain); *Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir. 1988) (allegation that inmate slept without mattress for one night is insufficient to state 8th Amendment violation and no amendment can alter that deficiency), *judgment vacated on other grounds*, 493 U.S. 801 (1989); *DeMallory v. Cullen*, 855 F.2d 442, 444 (7th Cir. 1988) (correctional officer spitting upon prisoner does not rise to level of constitutional violation). The evidence here, even when viewed in a light most favorable to Plaintiff, does not establish that Plaintiff suffered anything more than de minimis injuries for the three days he was placed on CSW. Accordingly, Defendants are entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 323.

C. Due Process

1. Denial of X-ray

1    Plaintiff claims that Defendant O'Donnell violated his right to due process when he
2    denied Plaintiff an opportunity to be X-rayed pursuant to prison regulations. (Compl. ¶ 78.)
3    Defendants argue that Plaintiff is mistaken for believing that the cited regulation creates such an
4    absolute right. (Mot. at 15.)
5    Section 52050.23.5 of the DOM states that "[t]he inmate may be subjected to an X-ray
6    examination in accordance with the Department Operations Manual [DOM], Section 52050.21
7    prior to their placement on contraband watch, and then again, there after, when it is determined
8    to be necessary by the HCM or a physician." (Mot. at 15-16.) Defendants assert that under this
9    regulation, only prison medical staff have the independent authority and discretion to either grant
10   or deny an inmate's request for an X-ray based purely on medical necessity. (*Id.*) Defendants
11   assert that when Plaintiff told Defendant O'Donnell that he wanted to be X-rayed, he did not
12   claim any particular medical concern. (O'Donnell Decl. ¶ 3.) Nor does Plaintiff allege
13   anywhere in his complaint that an X-ray should have been administered based on medical
14   necessity. Defendants assert that inmates are not given the opportunity to be x-rayed before
15   placement in contraband watch unless not doing so poses a medical risk. (*Id.*; Graves Decl. ¶ 4.,
16   Ex. A.) It is undisputed that Plaintiff was assessed by medical staff before placement on CSW,
17   and that the medical assessment results were documented on the proper form. (Lewis Decl. ¶ 7,
18   Ex. F.) There is no evidence in the record to indicate that Plaintiff had a medical condition
19   which necessitated an X-ray either prior to or after his placement on CSW. It cannot be said that
20   Defendants violated Plaintiff's due process right to an X-ray when his circumstances did not
21   indicate that it was medically necessary. Accordingly, Plaintiff has failed to raise a triable issue
22   as to whether Defendants violated his right to due process in denying him an X-ray.
23   Accordingly, Defendants are entitled to judgment as a matter of law on this claim. *See Celotex*
24   *Corp.*, 477 U.S. at 323.
25       2.    Placement on CSW
26   Defendants also argue that Plaintiff's right to due process with respect to his placement
27   on CSW as a whole was not violated. (Mot. at 16.) They argue that Plaintiff was afforded due
28

process because he was provided notice that he was being placed on CSW and the confinement lasted only three days. (Mot. at 18.)

Deprivations that are authorized by state law amount to deprivations of a liberty interest protected by due process, provided that (1) state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation, and (2) the liberty in question is one's freedom from a restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 477-87 (1995).[4] Whether a restraint is "atypical and significant" under Sandin requires a court to consider: "1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Id.* at 861.

No evidence is presented as to how the CSW conditions compare to those of administrative segregation or protective custody. At this stage, the Court will presume that the CSW conditions, such as the continual restraints and tubes over the hands and the absence of running water and toilet, are worse than the conditions of administrative segregation and protective custody. However, in this case the conditions lasted only a short period of time, and there is no argument or evidence that the CSW placement will have any effect on the duration of Plaintiff's sentence. For these reasons, the conditions do not amount to an "atypical and significant hardship" under *Sandin* so as to implicate a liberty interest protected by due process. *See, e.g., Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (under *Sandin* no liberty interest when inmate placed in disciplinary segregation for 14 days). Consequently, even when the evidence is viewed in a light most favorable to Plaintiff, his placement on CSW for three days did not violate his right to due process. Accordingly, Defendants are entitled to judgment as a matter of law on this claim. *See Celotex Corp.*, 477 U.S. at 323.

---

[4] A liberty interest is also implicated where the state action "will inevitably affect the duration of [a] sentence," *id.* at 487, but that is not at issue here.

D. <u>Supervisor Liability</u>

Plaintiff claims that Defendants Warden Jacquez and Health Care Manager McLean implemented the "unlawful, unauthorized, and unconstitutional policies and procedures (supplement to Department Operations Manual (D.O.M.) Section 52050…)" for CSW that resulted in the "physical pains, sufferings, and breathing difficulties Plaintiff experienced" while in CSW. (Compl. ¶ 60.) Plaintiff claims that they also approved the denial of sheets and blankets for warmth, as well as a shower with hygiene products. (*Id.* at ¶ 61.)

Plaintiff claims that Defendants Secretary Cate and Undersecretary Kernan implemented the relevant regulation that "authorizes the use of Duct Tape, leg and waist chains, with wrists cuffed to Plaintiff's side which was the direct result of Plaintiff's physical pain, suffering, and breathing difficulties." (*Id.* at ¶ 63.) Plaintiff claims that Defendants Cate and Kernan were aware through inmates' complaints and grievances that Defendants Jacquez and McLean had supplemented the DOM as discussed above, but that they did not take any action to correct it. (*Id.* at ¶ 64.)

Plaintiff's claim against these supervisory defendants fails because he does not allege that Defendants Jacquez, McLean, Cate and Kernan were ever directly involved with his placement in CSW and the conditions he faced therein. A supervisor may be liable under § 1983 upon a showing of: (1) personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Conversely, where there is no evidence that the supervisor was personally involved or connected to the alleged violation, the supervisor may not be liable. *See Edgerly v. City and County of San Francisco*, 599 F. 3d 946, 961-62 (9th Cir. 2010). Here, Plaintiff has failed to provide evidence showing that Defendants Jacquez, McLean, Cate and Kernan were ever personally involved or connected to the alleged violations. Furthermore, Plaintiff acknowledges that Defendant McLean has no involvement in this suit and indicates that he is dismissing her from this action. (Oppo. at 31.)

Plaintiff asserts in opposition that Defendants are responsible for the policies which authorized the inhumane conditions of CSW. However, "[a]bsent vicarious liability, each

Order Granting Defendants' Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.10\Treglia757_grant-msj.hhl.wpd                    13

Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). Plaintiff makes no factual allegations against these Defendants indicating that they knew personally that Plaintiff faced a substantial risk of harm, and consciously disregarded it by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. Furthermore, the Court has already determined that their subordinates did not violate Plaintiff's constitutional rights with respect to the conditions he faced while in CSW. *See supra* at 7-10. Accordingly, there is no basis for liability against Defendants Jacquez, McLean, Cate and Kernan, and they are entitled to summary judgment on the claims against them. *See Celotex Corp.*, 477 U.S. at 323.

        E.        <u>State Law Claim</u>

Defendants argue that Plaintiff's remaining state law claim should be dismissed for failure to comply with the California Tort Claims Act. (Mot. at 24.) They have filed a request for judicial notice of facts in support of their motion. (Docket no. 91.) The request is GRANTED. Based on the evidence submitted, Defendants have shown that Plaintiff's state law claim must be dismissed because Plaintiff did not comply with the California Tort Claim's Act deadlines for filing tort claim against the state government and state officials. *See* Cal. Gov. Code § 911.2. Plaintiff is silent in his opposition with respect to this claim. Accordingly, Plaintiff's state law claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants Matthew Cate, Francisco Jacquez, Ranell Chisman, Glenn Kelley, O'Donnell, Clancy, Scott Kernan, Maureen McLean, Carbrera, Dahard, Darby and C. Howell's motion for summary judgment is GRANTED.[5] (Docket no. 86.) The state law claim against them is also DISMISSED.

Plaintiff's motion for video conference, (Docket no. 112), is DENIED as moot.

The Clerk shall terminate all pending motions and close the file.

---

[5] Thus, the Court finds it unnecessary to address Defendants' argument that they are entitled to qualified immunity

1 | IT IS SO ORDERED.

3 | DATED: 3/22/12

*Lucy H. Koh*
LUCY H. KOH
United States District Judge